**COMMONWEALTH OIL REFINING COMPANY, INC., Plaintiff,**

**v.**

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Defendant.**

**Civ. A. No. SA–81–CA–647.**

United States District Court,
W.D. Texas,
San Antonio Division.

May 25, 1989.

---

Samuel D. Rosen, Milgrim, Thomajan & Lee, Austin, Tex., for plaintiff.

Nicholas M. Inzeo, Acting Associate General Counsel, Gary L. Janus, Thomas J. Schlageter, Wendy L. Adams, Gary L. Janus, U.S. E.E.O.C., no pro hac vice, Washington, D.C., for defendant.

## ORDER

PRADO, District Judge.

This case is before the Court on remand from the United States Court of Appeals for the Fifth Circuit, *Commonwealth Oil Refining Co., Inc. v. EEOC*, 720 F.2d 1383 (5th Cir.1983), which has ordered that this Court conduct an evidentiary hearing to determine if Plaintiff Commonwealth Oil Refining Co., Inc. was the prevailing party in the Title VII action upon which this suit is based, and whether Plaintiff is entitled to attorney's fees pursuant to 42 U.S.C. § 2000e–5(k) because the Title VII action was frivolous, unreasonable, groundless, or taken in bad faith. *Id.* at 1386.

On May 11, 1989, the Court conducted a hearing at which it received evidence and heard argument from counsel. After considering the evidence and arguments, and in light of the United States Supreme Court's recent decision in *Texas State Teachers Assoc. v. Garland Ind. School Dist.*, —— U.S. ——, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989), the Court has decided, for the reasons given below, that Plaintiff was not the prevailing party in the Title VII case and is thus not entitled to its attorney's fees.

## I. FACTUAL BACKGROUND

The Fifth Circuit's opinion on remand gives an excellent summary of the background of this case:

In February 1975, an EEOC charge was filed against Commonwealth alleging that the company was violating Title VII, 42 U.S.C. § 2000e *et seq.*, by discriminating against women and Puerto Ricans with respect to hiring, promotion and compensation at its Peneulas, Puerto Rico, petrochemical complex. An investigation followed and in February 1977 the EEOC issued a decision finding reasonable cause to believe specific portions of the charge true. Ensuing conciliation efforts, though complicated by Common-

wealth's intervening insolvency and Chapter XI reorganization proceeding, ultimately led to a conciliation agreement. A consent decree was entered by the parties and approved by the bankruptcy court in January 1981.

The consent decree set out procedures whereby Commonwealth was to publicize equal employment policies and programs, and provided for monitoring its compliance. Commonwealth agreed to increase the representation of Puerto Ricans and women in entry level positions in six different operational departments, and to contact local Puerto Rican colleges and referral agencies in its future recruitment efforts. The decree also instituted procedures to identify, and even counsel and train, current female employees for promotion into certain "target area jobs." Commonwealth agreed to budget $50,000 a year to fund these efforts. In addition, the consent decree provided relief for all identifiable women and Puerto Ricans against whom Commonwealth had discriminated in hiring or promotion between February 1973 and the date of the decree. The decree provided that a Special Master, empowered to award back wages and preferential seniority and order preferential hiring or promotion, would hear all cases that the parties could not resolve through informal conciliation efforts. A fund of one million dollars was established to satisfy any potential liability on these past claims.

Commonwealth's reorganization efforts proved successful, and in June 1981 a plan of arrangement was approved by the bankruptcy court. Subsequently, the company brought this action in federal district court seeking attorney's fees against the EEOC pursuant to § 706(k) of Title VII alleging that (a) it had prevailed against the EEOC in the proceedings initiated by the 1975 charge, and (b) that the EEOC had proceeded "in bad faith and with no reasonable belief in the merits of the factual and legal positions it espoused."

Commonwealth's Amended Complaint asserted three separate "claims for re-

lief" on which it purportedly prevailed. The first advanced two theories to conclude that Commonwealth had been the prevailing party under the consent decree: (a) that the decree contained "no remedy or relief for many of the more substantial discriminatory practices [that had been originally] alleged in the [EEOC's original charge and subsequent determination]"; and (b) that the decree ultimately entered by the parties afforded less relief than had been offered by Commonwealth to the EEOC in earlier conciliation negotiations. The second asserted that Commonwealth was a prevailing party in its successful effort (before entry of the consent decree) to defeat the EEOC's effort to evade Chapter XI's automatic stay provisions, Bkrtcy. R. 11–44(a), which barred the EEOC from commencing a Title VII suit in district court. The third asserted that Commonwealth had been a prevailing party because 77 of the 109 names initially identified as likely victims of past discrimination under the provisions of the consent decree were ultimately withdrawn.

*Commonwealth,* 720 F.2d at 1384 (footnote omitted).

Defendant's response to Plaintiff's claims is basically that it, rather than Plaintiff, prevailed in the Title VII action.

## II. DISCUSSION

This case was remanded for an evidentiary hearing on two issues: (1) whether Plaintiff prevailed in the Title VII action brought against it by Defendant, and (2) whether Plaintiff is entitled to attorney's fees under the standard enunciated in *Christianburg Garment Co. v. Equal Employment Opportunity Commission,* 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978). As indicated above, Plaintiff asserts three arguments in support of its claim to prevailing party status: (1) Defendant did not receive relief on its more substantial discrimination charges, (2) Plaintiff prevented Defendant's efforts to have the automatic stay lifted by the bankruptcy court, and (3) 77 of the 109 names of persons allegedly discriminated against by

Plaintiff were withdrawn by Defendant from the special master's consideration.

■ The Court does not believe that Plaintiff's success in defeating Defendant's attempt to evade the automatic stay or Defendant's withdrawal of a substantial number of the names originally submitted as victims of discrimination support a finding that Plaintiff prevailed in the Title VII case. As to the automatic stay, Plaintiff's procedural victory certainly cannot be construed as a victory on the merits of the Title VII action. As to the withdrawal of names, Plaintiff by implication admits that 32 names, a substantial number in this Court's view, remained for the special master's consideration and thus again, Plaintiff cannot be said to have prevailed on the merits. The Court shall therefore concentrate on Plaintiff's claim that it prevailed because Defendant did not receive relief on its more substantial discrimination charges.

[2] The decision as to who is the prevailing party in this case is controlled by the Supreme Court's very recent decision in *Texas States Teachers Assoc. v. Garland Independent School Dist.*, —— U.S. ——, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989), which explicitly rejected the Fifth Circuit's test for determining prevailing party status. The old Fifth Circuit test required that a party succeed on the "central issue" in the litigation and achieve the "primary relief" sought. *E.g., Simien v. San Antonio*, 809 F.2d 255, 258 (5th Cir.1987). The *Garland* test is less demanding than the Fifth Circuit's old test. It is stated and explained by the Supreme Court as follows:

> If the plaintiff has succeeded on "any significant issue in litigation which achieve[d] some of the benefit the parties sought in bringing suit" the plaintiff has crossed the threshold to a fee award of some kind.... "[[R]]espect for ordinary language requires that a plaintiff receive at least some relief on the merits of his claim before he can be said to prevail." ... Thus, at a minimum, to be considered a prevailing party within the meaning of § 1988 the plaintiff must be able to point to a resolution of the dispute which changes the legal relationship

> between itself and the defendant.... Beyond this absolute limitation, a technical victory may be so insignificant ... as to be insufficient to support prevailing party status.... Where the plaintiff's success on a legal claim can be characterized as purely technical or *de minimus*, a district court would be justified in concluding that even the "generous formulation" we adopt today has not been satisfied.... The touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute. Where such a change has occurred, the degree of the plaintiff's overall success goes to the reasonableness of the award ... not to the availability of a fee award *vel non*.

*Garland*, 109 S.Ct. at 1493.

■ It is worth noting that the Supreme Court focuses in *Garland* on prevailing *plaintiffs*. In the case at hand, the Court is faced with the question of whether Commonwealth, plaintiff here but defendant in the underlying Title VII action, prevailed. As to defendants, there is a two part test for determining prevailing party status. First, there is the threshold question of whether or not the defendant is the prevailing party. If it is determined that the defendant is the prevailing party, then it must be determined, pursuant to *Christianburg Garment Co. v. EEOC*, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978), whether plaintiff's action in bringing or continuing with the suit was frivolous, unreasonable or groundless. *Id.* at 422, 98 S.Ct. at 700–01. A prevailing defendant can only recover its attorney's fees if it meets the standard enunciated in *Christianburg*.

Turning to the initial issue of determining prevailing party status, the Court believes *Garland* provides the test for making such a determination as to both plaintiffs and defendants. The Court begins with the self-evident premise that only one party can be *the* prevailing party on a particular claim. *See* 42 U.S.C. § 2000e–5(k) (court may allow "the prevail-

ing party" its attorney's fees). To determine which party has prevailed, the courts have applied a single "prevailing party" test, *e.g., Commonwealth*, 720 F.2d at 1385 ("We have applied this test of 'prevailing party' status equally to both plaintiffs and defendants."), even though this test may have varied prior to *Garland* depending upon the circuit, *compare e.g., Simien v. San Antonio*, 809 F.2d 255, 258 (5th Cir. 1987) (central issue test) *with Gringas v. Lloyd*, 740 F.2d 210, 212 (2d Cir.1984) (substantial issue test).

It is not necessary or even logical that there be a "prevailing plaintiff" test which is different from a "prevailing defendant" test, a position advocated by Plaintiff, since the determination that one party prevailed necessarily entails a determination that the other party lost. *See Commonwealth*, 720 F.2d at 1386 ("Thus, the district court was required by Section 706(k) and case precedent to weigh the claims advanced by EEOC against the results obtained by it to determine whether Commonwealth was the prevailing party...."). During oral arguments, Plaintiff advanced what this Court sees as the logically unsupportable argument that, while *Garland* rejects the Fifth Circuit's central issue test for determining prevailing *plaintiff* status, the central issue test remains the standard, in the Fifth Circuit at least, by which to judge whether a *defendant* has prevailed. Plaintiff's theory obviously produces inconsistent results where a plaintiff may have prevailed on "any significant issue," per *Garland*, but failed to prevail on the central issue, per the old Fifth Circuit standard. Plaintiff's theory must therefore be rejected in favor of this Court's conclusion that *Garland* provides the test to decide prevailing party status as to both plaintiffs and defendants.

This position is not at odds with *Garland*'s holding that within a lawsuit, there may be several independent claims, some of which the plaintiff may have prevailed upon and some of which the defendant may have won. The Supreme Court explained:

Where the plaintiff's claims are based on different facts and legal theories, and the plaintiff has prevailed on only some of those claims, we indicated that "[t]he congressional intent to limit [fee] awards to prevailing parties requires that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim." ... In the more typical situation, where the plaintiff's claims arise out of a common core of facts, and involve related legal theories, the inquiry is more complex. In such a case, we indicated that "the most critical factor is the degree of success obtained." ... We noted that in complex civil rights litigation, "the plaintiff often may succeed in identifying some unlawful practices or conditions," but that "the range of possible success is vast," and the achievement of prevailing party status alone "may say little about whether the expenditure of counsel's time was reasonable in relation to the success achieved."

*Garland*, 109 S.Ct. at 1492.

Plaintiff has in fact adopted the position that Defendant's Title VII action consisted of at least three separate and independent claims; namely, a claim of discrimination on the basis of sex, a claim of discrimination on the basis of national origin, and a claim of discrimination through the application of Plaintiff's foreign service policy (FSP). Although it argues that it prevailed on all of these claims, Plaintiff strongly contends that, at a minimum, it prevailed on and is entitled to attorney's fees on the FSP claim, as evidenced by the settlement agreement itself which left the FSP in place. Exhibit P–3, Article III, at 3.[1]

■ The Court's view of the Title VII action is not, however, that Defendant brought three separate claims within a single lawsuit. Rather, Defendant's discrimination claims arose "out of a common core of facts, and involve[d] related legal theories." *Garland*, 109 S.Ct. at 1492. Look-

---

**1.** For purposes of this decision, the Court admitted into evidence and considered Plaintiff's Exhibits P–1, P–2, P–3 and P–252 and Defendant's Exhibits D–22 and D–23. All other exhibits were admitted at the parties' request solely for purposes of appeal.

ing at the initial charge of discrimination filed against Plaintiff in February 1975, this conclusion is clear. Defendant charged Plaintiff with the following policies and practices which unlawfully discriminated against females and Puerto Ricans, including:

1. The failure or refusal of [Plaintiff] to recruit and hire females and Puerto Ricans in the same manner and on the same basis as non-Puerto Rican males have been recruited and hired;

2. The assignment by [Plaintiff] of females and Puerto Ricans to positions with lower pay and less opportunity for advancement and promotion than those to which non-Puerto Rican males have been assigned;

3. The failure or refusal of [Plaintiff] to promote females and Puerto Ricans on the same basis as non-Puerto Rican males;

4. The use of English language tests for positions in which fluency in English is not a demonstrated job requirement, which has the effect of disproportionately excluding Puerto Ricans and favoring Anglos for such positions.

Exhibit P-1, at 2.[2] It is clear that Defendant's discrimination claims are so intertwined both legally and factually that they cannot be said to be separate and independent claims.

In light of Defendant's discrimination claims *and* the relief it achieved in the settlement, the Court is convinced that Plaintiff cannot succeed in its contention that it prevailed in the Title VII suit. Some of the more substantial relief Defendant received included Plaintiff's agreement to publicize equal employment policies and practices; to increase representation of Puerto Ricans and women in certain entry level positions; to contact local agencies for referrals in recruiting; to identify, counsel and train female employees for promotion and to budget $50,000 a year to accomplish this; and to set aside $1 mil-

lion[3] for payment to discriminatees pursuant to a special master's decision. *See* Exhibit P-3. Weighing the claims advanced by Defendant against these results, the Court finds that the legal relationship between the parties was changed in such a way as to render Defendant the prevailing party in the Title VII action. Further the Court finds that Defendant's victory was not merely "technical" or solely of "nuisance" value, but was real and substantial. *See Garland,* 109 S.Ct. at 1493 (technical victory or nuisance value settlement will not support finding of prevailing party status).

Finally, the Court finds Plaintiff cannot succeed in its contention that it prevailed even as to the FSP claim. Admittedly, the settlement agreement does not get rid of the FSP. The FSP was, however, just one example of the discrimination alleged by Defendant. It does not stand as a claim upon which Plaintiff could have prevailed separate from the remainder of the Title VII suit. Even if it was a separate claim, Defendant's decision to allow Plaintiff's FSP to remain in place does not necessarily mean Defendant was ever "wrong" in arguing that the FSP was discriminatory since the allegedly discriminatory effects of the FSP were greatly reduced by the other relief Defendant obtained in the settlement.

### III. CONCLUSION

To conclude, the Court finds Plaintiff is not entitled to its attorney's fees incurred in the underlying Title VII case because it cannot cross the threshold required to receive such fees—achieving prevailing party status. The Court thus need not address the *Christianburg* question of whether Defendant's pursuit of this action was unreasonable, groundless or in bad faith.

Accordingly, it is hereby ORDERED that Plaintiff's claims against Defendant are DISMISSED.

---

**2.** Defendant's Title VII complaint, filed in the bankruptcy court, further explains these claims. Exhibit P-252.

**3.** Of the $1 million, $220,000 in cash was ultimately paid out by Plaintiff. The remaining amounts determined to be owed were paid with securities issued by Plaintiff. Exhibit D-23, at 2-3.

It is further ORDERED that each party shall pay its own costs of court.